Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/12/2018 08:10 AM CDT

- 237 -

Nebraska Supreme Court Advance Sheets
300 Nebraska Reports
IN RE APPLICATION OF NORTHEAST NEB. PUB. POWER DIST.
Cite as 300 Neb. 237

In re Application of Northeast Neb. Pub. Power Dist.
Northeast Nebraska Public Power District
et al., appellants, v. Nebraska Public
Power District, appellee.

___ N.W.2d ___

Filed June 15, 2018.    No. S-17-529.

1. **Nebraska Power Review Board: Arbitration and Award: Appeal and Error.** On an appeal from the decision of an arbitration board convened under Neb. Rev. Stat. § 70-1301 et seq. (Reissue 2009), trial in the appellate court is de novo on the record.

2. **Nebraska Power Review Board: Arbitration and Award: Evidence: Appeal and Error.** Despite de novo review, when credible evidence is in conflict on material issues of fact, the appellate court will consider and may give weight to the fact that the arbitration board under Neb. Rev. Stat. § 70-1301 et seq. (Reissue 2009) observed the witnesses and accepted one version of the facts over another.

3. **Jurisdiction: Appeal and Error.** Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it.

4. ____: ____. An appellate court has an independent duty to decide jurisdictional issues on appeal, even if the parties have not raised the issue.

5. **Jurisdiction: Words and Phrases.** Subject matter jurisdiction is the power of a tribunal to hear and determine a case in the general class or category to which the proceedings in question belong and to deal with the general subject matter involved.

6. **Jurisdiction.** A lack of subject matter jurisdiction may be raised at any time by any party or by the court sua sponte.

7. **Jurisdiction: Appeal and Error.** When a trial court lacks the power, that is, jurisdiction, to adjudicate the merits of a claim, an appellate court also lacks the power to adjudicate the merits of the claim.

8. **Arbitration and Award: Jurisdiction: Statutes.** An arbitration board under Neb. Rev. Stat. § 70-1301 et seq. (Reissue 2009), as a creature

- 238 -

Nebraska Supreme Court Advance Sheets
300 Nebraska Reports
IN RE APPLICATION OF NORTHEAST NEB. PUB. POWER DIST.
Cite as 300 Neb. 237

of statute, has only such authority as has been conferred upon it by statute.

9. **Statutes: Legislature: Intent.** Components of a series or collection of statutes pertaining to a certain subject matter are in pari materia and should be conjunctively considered and construed to determine the intent of the Legislature, so that different provisions are consistent, harmonious, and sensible.

10. **Public Utilities.** Persons receiving similar service from a public power district under similar circumstances cannot be charged for such service in an arbitrary, designed, dissimilar manner.

11. **Contracts: Parties.** The implied covenant of good faith and fair dealing exists in every contract and requires that none of the parties to the contract do anything which will injure the right of another party to receive the benefit of the contract.

12. ____: ____. The nature and extent of an implied covenant of good faith and fair dealing are measured in a particular contract by the justifiable expectations of the parties. Where one party acts arbitrarily, capriciously, or unreasonably, that conduct exceeds the justifiable expectations of the second party.

13. ____: ____. A violation of the covenant of good faith and fair dealing occurs only when a party violates, nullifies, or significantly impairs any benefit of the contract.

Appeal from the Power Review Board. Affirmed.

Steven D. Davidson and David C. Levy, of Baird Holm, L.L.P., for appellants.

Kile Johnson and Corey Wasserburger, of Johnson, Flodman, Guenzel & Widger, and John C. McClure, of Nebraska Public Power District, for appellee.

Heavican, C.J., Cassel, Stacy, and Funke, JJ., and Steinke, District Judge.

Cassel, J.

## I. INTRODUCTION

This is our first opinion addressing an appeal from an arbitration board's decision under Neb. Rev. Stat. §§ 70-1301 to 70-1329 (Reissue 2009). After Nebraska Public Power District (NPPD) provided a discount to wholesale customers

who renewed their contractual relationship, some nonrenewing customers initiated statutory arbitration. They alleged that the discount was discriminatory and an abuse of NPPD's statutory rate-setting authority,[1] but the arbitration board disagreed. Upon our de novo review, we conclude that the discount was reasonable and not arbitrary and that it did not breach the contract or the covenant of good faith. Accordingly, we affirm the arbitration board's decision.

## II. BACKGROUND

### 1. Overview of Wholesale Rate Dispute Process

Nebraska's public policy is to "provide adequate electrical service at as low overall cost as possible, consistent with sound business practices."[2] To further that policy, "electric service should be provided by nonprofit entities including public power districts, public power and irrigation districts, nonprofit electric cooperatives, and municipalities."[3] Public power districts are required by law to fix rates which are fair, reasonable, and nondiscriminatory.[4]

In 1979, the Legislature enacted §§ 70-1301 to 70-1329[5] to provide a method to quickly and fairly resolve wholesale electric rate disputes.[6] If a wholesale purchaser elects to dispute a portion of the wholesale electric charge established by a supplier[7] and the dispute remains unresolved 45 days after the supplier receives written notice of the dispute, the dispute shall be submitted to arbitration.[8] The arbitration board is

---

[1] See Neb. Rev. Stat. § 70-655(1) (Cum. Supp. 2016).

[2] § 70-1301.

[3] Id.

[4] See §§ 70-655(1) and 70-1302.

[5] See 1979 Neb. Laws, L.B. 207.

[6] See § 70-1302.

[7] See § 70-1304.

[8] See § 70-1306.

- 240 -

Nebraska Supreme Court Advance Sheets
300 Nebraska Reports
IN RE APPLICATION OF NORTHEAST NEB. PUB. POWER DIST.
Cite as 300 Neb. 237

composed of three members: one selected by the purchaser, one selected by the supplier, and a third selected by the other two arbitrators.[9] At a hearing, the arbitration board hears testimony and receives evidence relating to the dispute.[10] Within 30 days after completion of the hearing, the arbitration board shall render a written decision.[11] And within 5 days of the date of the decision, the arbitration board shall file the decision along with all the pleadings and exhibits with the secretary of the Nebraska Power Review Board.[12]

A party who is unsatisfied with the arbitration board's decision may appeal to reverse, vacate, or modify the decision.[13] To do so, the party must file a notice of appeal with the Nebraska Power Review Board within 30 days after the arbitration board's decision is filed with the Nebraska Power Review Board.[14] "Trial in the appellate court shall be de novo on the record."[15] As noted, this is our first such decision concerning such an appeal from the arbitration board. We now turn to the facts of the case.

## 2. Contracts

NPPD, a public power district, derives the majority of its revenue from wholesale power supply contracts with political subdivisions in Nebraska. These wholesale power supply contracts often are the largest single financial obligation of the purchasing political subdivision.

The appellants (hereinafter purchasers) are political subdivisions engaged in the distribution of electricity to retail electric customers. They are wholesale customers of NPPD.

---

[9] See § 70-1307.

[10] See § 70-1318.

[11] See § 70-1320.

[12] See § 70-1321.

[13] See § 70-1325.

[14] See § 70-1326.

[15] § 70-1327.

Purchasers are parties to NPPD's 2002 wholesale power contract (2002 WPC).

The 2002 WPC included a 20-year term beginning on January 1, 2002. After December 31, 2021, the 2002 WPC would automatically renew from year to year unless terminated with 5 years' notice by either party.

The 2002 WPC obligated wholesale customers to purchase their full energy requirements from NPPD for the first 6 years of the contract. After that point, a wholesale customer could limit or reduce its purchases of demand and energy from NPPD in varying amounts depending on the length of advance notice provided to NPPD. To limit purchases meant that a customer could continue to buy power in the same amount as on the date of its notice to NPPD, but that it would not buy any future growth in its electricity from NPPD going forward. To reduce purchases meant that the customer could purchase less than its full requirements from NPPD. The 2002 WPC imposed no fee or rate increase in exchange for the privilege to limit or reduce purchases. Each purchaser had given, or intended to give, notice to NPPD of its intention to limit or reduce its purchases, which reductions would commence at various times on and after January 1, 2017.

The 2002 WPC listed different types of costs that NPPD was authorized to include in its revenue requirement for rate-setting purposes. One such cost was "amounts reasonably required to be set aside in reserves for items of costs the payment of which is not immediately required, such as . . . post-retirement employee benefit reserves." Thus, the 2002 WPC allowed NPPD to include in its revenue requirements a reasonable amount to be set aside for other postemployment benefits (OPEB). OPEB are benefits promised to employees once they retire. They are unfunded liabilities associated with past service.

In 2009, NPPD formed a contract strategy team to look at options for extension of the 2002-era contracts. NPPD desired more certainty in its revenue stream than that provided by

- 242 -

Nebraska Supreme Court Advance Sheets
300 Nebraska Reports
IN RE APPLICATION OF NORTHEAST NEB. PUB. POWER DIST.
Cite as 300 Neb. 237

the 2002 WPC. And NPPD believed that the provisions of the 2002 WPC permitting customers to limit or reduce their purchases would allow some customers to economically disadvantage others.

In 2013, NPPD initiated negotiations to replace the 2002 WPC with a new standard wholesale contract. The negotiations resulted in a 20-year contract beginning on January 1, 2016, and ending on December 31, 2035 (2016 WPC). A customer under the 2016 WPC could not limit or reduce its purchases unless NPPD failed to meet certain performance standards. NPPD decided to charge extending and nonextending customers the same general firm power service rate. But as an incentive to get customers to execute a new contract, NPPD created a discount for renewing customers. Thus, the 2016 WPC provides a rate discount through December 31, 2021, at an amount to be approved by the NPPD board of directors. Purchasers did not execute the 2016 WPC.

### 3. Funding OPEB Obligation

Prior to 2007, NPPD funded its OPEB obligation on a "pay-as-you-go" basis. In 2007, the Governmental Accounting Standards Board implemented Governmental Accounting Standards Board Statement No. 45. This statement required NPPD to use actuaries to calculate and identify its unfunded OPEB liability and include those amounts in notes to its financial statements. It allowed NPPD to amortize the unfunded OPEB liability over a period up to 30 years. The statement also introduced the concept of the annual required contribution, which is the theoretical amount, if contributed consistently each year, that would fully prefund future retiree benefits associated with benefits earned for past service.

NPPD then explored its options for accounting and reporting of OPEB. One was continuation of "pay-as-you-go." This had the lowest impact on rates. However, because of a perception that NPPD was not addressing the liability, it had the potential for a negative response from rating agencies and the investment community. Another option was to put the annual

- 243 -

Nebraska Supreme Court Advance Sheets
300 Nebraska Reports
IN RE APPLICATION OF NORTHEAST NEB. PUB. POWER DIST.
Cite as 300 Neb. 237

required contribution into 1 year's rates. That would mean adding approximately $36 million as a revenue requirement in the rate-setting process and collecting the full sum from customers in rates within a 1-year period. A third option was to borrow money toward the OPEB liability. NPPD could borrow money, and the debt service from the borrowing would be added into the revenue requirements used to set rates.

At that point, NPPD adopted a plan to obtain additional funding in rates. Under the plan, NPPD would continue on the pay-as-you-go basis for 2007. Through rates, NPPD would collect $4 million over the pay-as-you-go amount between 2008 and 2013, and then $10 million above the pay-as-you-go amount thereafter. The money would fund an OPEB trust, which was projected to be fully funded by 2033.

By 2011, actuarial studies showed that NPPD would need to contribute more in order to have the liability funded by 2033. NPPD decided to accelerate the collection of the OPEB liability to the 6-year term remaining in the 2002 WPC. Otherwise, based on purchasers' notifications of reductions, purchasers would be able to avoid 40 percent of their pro rata share of the OPEB obligation. NPPD estimated the liability to be $155 million. To collect that amount over 6 years, NPPD increased the annual budgeted contribution to the OPEB trust by $25 million. NPPD referred to it as a "catch-up."

The Governmental Accounting Standards Board also created Governmental Accounting Standards Board Statement No. 75, which became effective for fiscal years ending after June 2017. This statement no longer permitted disclosure of OPEB in notes to the financial statements; it required entities such as NPPD to recognize the entire OPEB as a "hard" liability on its balance sheet. Because the statement recommended early implementation, NPPD chose to do so for the 2016 year end.

### 4. 2016 and 2017 Rates

The inclusion of the $25 million in OPEB catch-up expense resulted in a 3.7-percent increase for 2016 rates. Wholesale

- 244 -

Nebraska Supreme Court Advance Sheets
300 Nebraska Reports
IN RE APPLICATION OF NORTHEAST NEB. PUB. POWER DIST.
Cite as 300 Neb. 237

customers who elected to sign the 2016 WPC received a 3.57-percent discount on the rate in 2016. The 2017 rate similarly included $25 million for accelerated funding of the OPEB trust and a discount for customers who signed the 2016 WPC.

### 5. Complaint

Purchasers filed a complaint against NPPD before the arbitration board. They alleged that NPPD violated § 70-655(1), claiming that the 2016 rate was discriminatory. Purchasers alleged that the 2016 rate was formulated and implemented in breach of the 2002 WPC. They further claimed that NPPD breached the implied covenant of good faith and fair dealing by charging them a different rate. They sought declaratory relief and damages. Purchasers later filed an amended complaint to challenge the 2017 rate on similar grounds.

At a hearing, the arbitration board received extensive evidence. We will discuss the evidence in more detail in the analysis section of the opinion.

### 6. Arbitration Board's Decision

The arbitration board determined that the 2016 and 2017 rates were reasonable. It stated that the OPEB catch-up amounts were reasonable, because they related to the value of the service rendered to purchasers during their years of taking service from NPPD. It further stated that NPPD did not arbitrarily select the amounts to include in the catch-up, but, rather, those amounts were "the product of a systematic study of the actuarial liability of OPEB attributable to production-level services."

The arbitration board also determined that the 2016 and 2017 rates were nondiscriminatory. It reasoned that the discount merely deferred the collection of the 2016 and 2017 catch-up amounts for customers under the 2016 WPC. The board explained:

Customers under the 2002 WPC and the 2016 WPC are taking the same service from NPPD and charged

the same rate. The customers operate under two separate and differing contracts, fairly negotiated. The 2016 customers gave up some rights they had under the 2002 WPC and accepted new terms including the deferred collection of the OPEB Catch-Up amounts included in the 2016 and 2017 rates. Customers under the 2016 WPC have over 18 years left in their comm[i]tment to NPPD, whereas [purchasers] have just over 4 years. This differentiated approach is fair and reasonable as relating to the collection of a liability that solely relates to past services.

Finally, the board determined that NPPD did not breach the 2002 WPC or the covenant of good faith and fair dealing. The board therefore denied all of purchasers' requests and determined that the 2016 and 2017 rates met the standards established by § 70-655(1).

Purchasers appealed, and we granted their petition to bypass review by the Nebraska Court of Appeals.

## III. ASSIGNMENTS OF ERROR

Purchasers assign that the arbitration board erred in (1) failing to find NPPD's 2016 and 2017 wholesale rate structure violated § 70-655(1), (2) failing to find NPPD's 2016 and 2017 wholesale rate structure breached the 2002 WPC, and (3) failing to find NPPD violated the duty of good faith and fair dealing under the 2002 WPC.

## IV. STANDARD OF REVIEW

[1,2] On an appeal from the decision of an arbitration board convened under § 70-1301 et seq., trial in the appellate court is de novo on the record.[16] Despite de novo review, when credible evidence is in conflict on material issues of fact, the appellate court will consider and may give weight to the fact that the trial court observed the witnesses and accepted one version of

---

[16] § 70-1327.

- 246 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
300 NEBRASKA REPORTS
IN RE APPLICATION OF NORTHEAST NEB. PUB. POWER DIST.
Cite as 300 Neb. 237

the facts over another.[17] We apply this same rule in an appeal from an arbitration board under this statutory scheme.

## V. ANALYSIS

### 1. JURISDICTION

[3,4] Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it.[18] Neither party challenges the arbitration board's jurisdiction to decide the matters presented to it. But an appellate court has an independent duty to decide jurisdictional issues on appeal, even if the parties have not raised the issue.[19]

[5-7] Subject matter jurisdiction is the power of a tribunal to hear and determine a case in the general class or category to which the proceedings in question belong and to deal with the general subject matter involved.[20] A lack of subject matter jurisdiction may be raised at any time by any party or by the court sua sponte.[21] When a trial court lacks the power, that is, jurisdiction, to adjudicate the merits of a claim, an appellate court also lacks the power to adjudicate the merits of the claim.[22] We begin by considering whether the arbitration board had subject matter jurisdiction over the issues presented to it.

The parties presented three issues to the arbitration board, and those same three issues are before us on appeal. The issues

---

[17] See *Mock v. Neumeister*, 296 Neb. 376, 892 N.W.2d 569 (2017). See, also, *In re Interest of Steven S.*, 299 Neb. 447, 908 N.W.2d 391 (2018); *Erin W. v. Charissa W.*, 297 Neb. 143, 897 N.W.2d 858 (2017); *Strohmyer v. Papillion Family Medicine*, 296 Neb. 884, 896 N.W.2d 612 (2017); *Lingenfelter v. Lower Elkhorn NRD*, 294 Neb. 46, 881 N.W.2d 892 (2016).

[18] *Boyd v. Cook*, 298 Neb. 819, 906 N.W.2d 31 (2018).

[19] *Davis v. State*, 297 Neb. 955, 902 N.W.2d 165 (2017).

[20] *Boyd v. Cook, supra* note 18.

[21] *Id.*

[22] *Cappel v. State*, 298 Neb. 445, 905 N.W.2d 38 (2017).

- 247 -

Nebraska Supreme Court Advance Sheets
300 Nebraska Reports
IN RE APPLICATION OF NORTHEAST NEB. PUB. POWER DIST.
Cite as 300 Neb. 237

concern the validity of NPPD's rate structure, whether NPPD breached its contract with purchasers, and whether NPPD breached the covenant of good faith and fair dealing. Because this case was brought under § 70-1301 et seq., we must determine whether the arbitration board had subject matter jurisdiction over all of the issues.

[8] The arbitration board, as a creature of statute, has only such authority as has been conferred upon it by statute.[23] Statutes have clearly empowered an arbitration board to determine a wholesale electric rate dispute.[24] But it is less clear whether the arbitration board also has jurisdiction over the contractual issues presented in this case.

[9] Reading the statutes in §§ 70-1301 to 70-1329 as a whole leads us to conclude that the arbitration board's jurisdiction is not limited to deciding a dispute over the establishment of a wholesale rate. Components of a series or collection of statutes pertaining to a certain subject matter are in pari materia and should be conjunctively considered and construed to determine the intent of the Legislature, so that different provisions are consistent, harmonious, and sensible.[25] One section empowers the board to resolve not just wholesale rate disputes but also "rate disputes relating to transmission and delivery of electrical energy."[26] A dispute may address "all or any portion of the wholesale electric charge."[27] The dispute could concern a "mathematical, metering, or quantity error in the billing."[28] And that the arbitration board may consider more than merely the wholesale rate to be charged is implicit in the Legislature's directive that the parties meet with the

---

[23] See, generally, *Interiano-Lopez v. Tyson Fresh Meats*, 294 Neb. 586, 883 N.W.2d 676 (2016).

[24] See, e.g., §§ 70-1302, 70-1304, 70-1306, and 70-1307.

[25] *In re Trust of Shire*, 299 Neb. 25, 907 N.W.2d 263 (2018).

[26] § 70-1302.

[27] § 70-1304. See, also, § 70-1305 ("disputed portion").

[28] § 70-1304.

arbitration board "for the purpose of clarifying and narrowing the specific issues from those set forth in the detailed statement of disputed issues."[29]

An arbitrated dispute may be intertwined with contractual issues. The Legislature clearly contemplated the existence of power contracts.[30] Often, such contracts speak to amounts that may be charged for electricity. In order to resolve a dispute, an arbitration board may need to determine whether there was contractual compliance. The arbitration board has authority to "consider only those matters necessary for the resolution of the disputed issues" but it may "not alter or modify any existing contract."[31] We conclude that where, as here, contractual issues are intertwined with a rate dispute, such contractual issues are within the arbitration board's jurisdiction.

We note that no party is attacking the constitutionality of the statutes contained in §§ 70-1301 to 70-1329. We express no opinion on the relationship of these statutes to the jurisdiction conferred upon a district court under the Nebraska Constitution.[32]

## 2. WHETHER RATE STRUCTURE VIOLATES § 70-655(1)

### (a) Additional Evidence at Hearing

NPPD presented considerable evidence concerning its efforts to address its unfunded OPEB liability. NPPD's wholesale billing manager testified that if NPPD had collected the full unfunded OPEB obligation of $150 million in 1 year, it would have resulted in a rate increase of over 22 percent— a much larger rate increase than the 3.7 percent that was implemented. The manager testified as to the amounts of purchasers' pro rata shares of OPEB that they could avoid by

---

[29] § 70-1312.

[30] See §§ 70-1303, 70-1304, and 70-1314.

[31] See § 70-1314.

[32] See Neb. Const. art. V, § 9.

- 249 -

Nebraska Supreme Court Advance Sheets
300 Nebraska Reports
IN RE APPLICATION OF NORTHEAST NEB. PUB. POWER DIST.
Cite as 300 Neb. 237

reducing their purchases under the 2002 WPC. In the aggregate, purchasers potentially could avoid $3,750,000 of their pro rata share of the $150 million OPEB catch-up collection. The manager emphasized fairness and reasonableness and stated that because the costs were associated with past service, NPPD needed to find a way to recover the costs from all of its customers who had benefited from them. He believed that NPPD's methodology was reasonable because it tried to recover the unfunded obligation over a 6-year period, which was the remaining time period in the 2002 WPC.

NPPD's chief financial officer testified that in 2016, NPPD borrowed approximately $23 million on behalf of the 2016 WPC customers by issuing taxable debt to generate bond proceeds. The interest on the borrowing was capitalized through 2021. NPPD borrowed a similar amount under similar terms for the 2017 catch-up. The chief financial officer explained that purchasers and customers under the 2016 WPC "are both being charged the exact same rate, except for the 2016 contract customers I have borrowed their pro rata share and made that deposit into the OPEB trust and I've recorded a regulatory asset that says they will have to pay that beginning in 2022." Because the rates are identical, the difference in what is charged and collected is a function of the discount. With the discount, OPEB gets paid from two sources: contributions from ratepayers and investment earnings in the trust.

According to the chief financial officer, the purpose of the discount would be "deferring the collection of that 2016 and now 2017 catch-up amount until 2022 through 2033, the same time period." She explained that the wholesale customers would pay the same amount, but it would be collected over a different time period. In order for the delayed payments to equate to a payment today, NPPD would have to apply a discount rate between 3.37 and 3.9 percent. The chief financial officer testified that the discount was "a mechanism to fairly collect the OPEB catch-up from two different customer groups."

- 250 -

Nebraska Supreme Court Advance Sheets
300 Nebraska Reports
IN RE APPLICATION OF NORTHEAST NEB. PUB. POWER DIST.
Cite as 300 Neb. 237

Purchasers' expert, David Dismukes, a consulting economist, viewed purchasers and the customers under the 2016 WPC as similarly situated in terms of the nature of the power service they receive from NPPD. Dismukes testified that customers can be charged different rates, but that the rates "have to be justifiable and there has to be a cost basis for that."

Dismukes opined that the rate structure created discrimination between the two sets of customers. He explained that similarly situated customers were being assessed rates that differed for taking similarly situated services. According to Dismukes, there were no cost differences between the two groups of customers. The signing of the 2016 WPC was the only difference, and Dismukes did not believe that the execution of a new contract justified a different rate. He testified that there was no legitimate cost basis supporting the discount mechanism. Based on Dismukes' knowledge of the industry, he believed that a discount for one subset of customers and not the other constituted rate discrimination.

From a cost-based rate-setting perspective, Dismukes disagreed with testimony to the effect that both groups would ultimately pay the same amount. He pointed out that "a dollar today is not the same as a dollar tomorrow" and that there was a benefit to not making the payment today. He testified that the timing difference created an economic advantage of sufficient consequence to support a finding of discrimination. Thus, Dismukes opined that NPPD did not set its rates in a manner that was fair, reasonable, and nondiscriminatory.

NPPD's expert, Joseph Mancinelli, the general manager and president of a consulting firm specializing in management economics predominantly serving the public power market, disagreed. He opined that NPPD's 2016 and 2017 rates were fair, reasonable, and nondiscriminatory. In arriving at that conclusion, he looked at the unfunded accrued OPEB liability, which was incurred over a historical period and was directly attributed to the labor of retirees. He testified that it was proper to recover those costs from customers who enjoyed

those benefits, i.e., the 2002 WPC and 2016 WPC customers. Mancinelli believed that the rates were adequate and would support the revenue requirement.

Mancinelli explained that there was one rate and that the difference was the source of the funding of the OPEB liability. Because the 2016 WPC customers had a long contract, the cost was financed. But financing was not an option for the 2002 WPC customers, so the funding came out of rate revenues. He stated that the source of the funds created a difference and that difference "is the genesis of what we call the discount."

Mancinelli believed that the cost of borrowing the money was not materially different from the discount. He testified that the discount was cost based and that it was basically the difference between funding the trust with cash from revenues or funding the trust with borrowed funds. Mancinelli was unaware of any other utility imposing a rate increase for the exclusive purpose of collecting money for an OPEB trust. Although NPPD's situation and solution was unique, he opined that it met the test of being fair, reasonable, and nondiscriminatory.

### (b) Discussion

Purchasers contend that the rate structure for 2016 and 2017 violates § 70-655. That statute requires NPPD's board of directors to fix adequate rates that are "fair, reasonable, nondiscriminatory, and so adjusted as in a fair and equitable manner to confer upon and distribute among the users and consumers . . . the benefits of a successful and profitable operation and conduct of the business of the district."[33] As the party claiming discrimination, purchasers have the burden of proof to establish its existence.[34]

[10] Purchasers rely on *McGinley v. Wheat Belt P.P. Dist.*[35] In that case, a wholesale distributor informed Wheat Belt

---

[33] § 70-655(1).

[34] See 12 Eugene McQuillin, The Law of Municipal Corporations § 35:57 (3d ed. 2017).

[35] *McGinley v. Wheat Belt P.P. Dist.*, 214 Neb. 178, 332 N.W.2d 915 (1983).

Public Power District (Wheat Belt) that the distributor would be imposing a surcharge on Wheat Belt, which would be assessed on the basis of Wheat Belt's summer peak demand. To deal with the surcharge, Wheat Belt created two classes of customers based on the date the customer requested service. Customers before a certain date would be protected from increased costs associated with the surcharge, on the theory that it was the new customers who were causing the increased summer peak demand. As a result, Wheat Belt charged markedly different rates for customers receiving similar service. We concluded that Wheat Belt's action in establishing two classes of customers and assessing most of the surcharge to one class was arbitrary and discriminatory. We stated, "Persons receiving similar service under similar circumstances cannot be charged for such service in an arbitrary, designed, dissimilar manner."[36]

*McGinley* is distinguishable from the situation at hand. There, Wheat Belt wanted to assess the bulk of a surcharge against one class of customers. To do so, it wanted to charge different rates to similarly situated customers. Here, NPPD is charging but one rate—purchasers are charged the same rate as NPPD's customers under the 2016 WPC. The difference between the amounts charged to purchasers and the 2016 WPC customers is attributable to a discount for the 2016 WPC customers. Of course, under some circumstances, charging one rate but conferring a discount upon some customers could be discriminatory. But here, as discussed below, there was a reasonable basis for NPPD's ratemaking determination.

The discount is tied to the OPEB liability. That liability relates solely to past services of NPPD employees, and purchasers received the benefit of those services. Because a specific portion of OPEB cannot be connected to any particular customer, NPPD allocated the liability on a pro rata basis. It is reasonable for purchasers to pay their pro rata share of

---

[36] *Id.* at 187, 332 N.W.2d at 920.

- 253 -

Nebraska Supreme Court Advance Sheets
300 Nebraska Reports
IN RE APPLICATION OF NORTHEAST NEB. PUB. POWER DIST.
Cite as 300 Neb. 237

the liability. And the catch-up amounts, which were based on actuarial studies, are not arbitrarily established.

There is a reasonable basis for the discount. If a variance in rates is based upon a reasonable and fair difference in conditions that equitably and logically justifies a different rate, any discrimination is not unjust.[37] Purchasers opted not to extend their contractual relationship with NPPD; thus, NPPD had a shorter period of time in which to collect purchasers' pro rata share of the liability. On the other hand, customers under the 2016 WPC extended their relationship with NPPD for an additional 20 years, thereby giving NPPD a longer period of time over which to collect those customers' pro rata share.

NPPD crafted a plan to collect the OPEB catch-up expense at different times. Under the plan, purchasers pay their portion of the OPEB catch-up expense over the 6 years remaining on their contract, while customers under the 2016 WPC get a discount during those years and will pay the catch-up expense between 2022 and 2033. It is the difference in the remaining terms of the contractual relationship with NPPD between purchasers and customers under the 2016 WPC that allows for the different collection of the OPEB liability. The effort to fund the OPEB trust through catch-up amounts in 2016 and 2017 was an effort to mitigate the risk of shifting the cost of the common liability onto the customers under the 2016 WPC. Under the circumstances of this case, the discount for one group of customers is not discriminatory.

The methodology assured that both classes of customers would pay an equal share of OPEB costs—the difference would be solely in the timing of the payments. Contrary to purchasers' argument, the financing scheme imposed a future cost sufficient to remedy the advantage that the 2016 WPC customers otherwise would have had from paying their share later. In other words, an approximation of the time value of

---

[37] See 14 William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations § 6681 (Carol A. Jones ed., perm. ed., rev. vol. 2012).

- 254 -

Nebraska Supreme Court Advance Sheets
300 Nebraska Reports
IN RE APPLICATION OF NORTHEAST NEB. PUB. POWER DIST.
Cite as 300 Neb. 237

money was built into the mechanism employed to ensure that both classes of customers were treated fairly. In evaluating the experts' testimony, the arbitration board had the advantage of observing them and making judgments considering their credibility. We have considered and given weight to that fact.

### 3. Whether Rate Structure Breached 2002 WPC

Purchasers next argue that the discount constitutes a breach of the 2002 WPC. It does not. Under the 2002 WPC, purchasers agreed to pay "amounts reasonably required to be set aside in reserves for items" such as OPEB. The catch-up amounts were reasonably within the definition of revenue requirements. This assignment of error lacks merit.

### 4. Whether Rate Structure Breached Covenant of Good Faith

[11,12] Finally, purchasers argue that the discount breached the covenant of good faith and fair dealing. The implied covenant of good faith and fair dealing exists in every contract and requires that none of the parties to the contract do anything which will injure the right of another party to receive the benefit of the contract.[38] The nature and extent of an implied covenant of good faith and fair dealing are measured in a particular contract by the justifiable expectations of the parties. Where one party acts arbitrarily, capriciously, or unreasonably, that conduct exceeds the justifiable expectations of the second party.[39]

[13] Purchasers claim that giving a discount to the 2016 WPC customers penalized purchasers for exercising their contractual right to purchase energy elsewhere. We disagree. The availability of the discount was not connected to whether a

---

[38] *Coffey v. Planet Group*, 287 Neb. 834, 845 N.W.2d 255 (2014).

[39] *Id.*

customer reduced or limited its energy purchases from NPPD; rather, it was available to all customers under the 2016 WPC. A violation of the covenant of good faith and fair dealing occurs only when a party violates, nullifies, or significantly impairs any benefit of the contract.[40] Purchasers did not have a right to avoid paying amounts toward unfunded accrued liability for OPEB. They have failed to show that NPPD significantly impaired any benefit of the 2002 WPC.

## VI. CONCLUSION

We conclude that NPPD's rate structure for 2016 and 2017 was fair, reasonable, and nondiscriminatory. We further conclude that the rate structure did not constitute a breach of either the 2002 WPC or the implied covenant of good faith and fair dealing. Accordingly, we affirm the decision of the arbitration board.

AFFIRMED.

WRIGHT and MILLER-LERMAN, JJ., not participating.

---

[40] *Id.*