Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/28/2018 08:13 AM CDT

- 147 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
301 NEBRASKA REPORTS
CITY OF SIDNEY v. MUNICIPAL ENERGY AGENCY OF NEB.
Cite as 301 Neb. 147

CITY OF SIDNEY, NEBRASKA, APPELLEE, v. MUNICIPAL
ENERGY AGENCY OF NEBRASKA, APPELLANT.

___ N.W.2d ___

Filed September 28, 2018.    No. S-17-471.

1. **Nebraska Power Review Board: Arbitration and Award: Appeal and Error.** On an appeal from the decision of an arbitration board convened under Neb. Rev. Stat. § 70-1301 et seq. (Reissue 2009), trial in the appellate court is de novo on the record.
2. **Nebraska Power Review Board: Arbitration and Award: Evidence: Appeal and Error.** Despite de novo review, when credible evidence is in conflict on material issues of fact, the appellate court will consider and may give weight to the fact that the arbitration board observed the witnesses and accepted one version of the facts over another.
3. **Nebraska Power Review Board: Arbitration and Award: Contracts.** Where contractual issues are intertwined with a rate dispute, such contractual issues are within the jurisdiction of an arbitration board convened under Neb. Rev. Stat. § 70-1301 et seq. (Reissue 2009).
4. **Nebraska Power Review Board: Arbitration and Award: Notice.** Under Neb. Rev. Stat. § 70-1306 (Reissue 2009), an arbitration board is authorized to permit amendments to a notice, substantive or not, at any time in the arbitrative proceedings.
5. **Public Utilities: Proof.** The purchaser of energy has the burden of proving that the transmission rate it is being charged is unfair, unreasonable, or discriminatory.
6. **Contracts.** In interpreting a contract, a court must first determine, as a matter of law, whether the contract is ambiguous.
7. ____. A contract written in clear and unambiguous language is not subject to interpretation or construction and must be enforced according to its terms.
8. **Contracts: Substantial Performance.** To establish substantial performance under a contract, any deviations from the contract must be relatively minor and unimportant.

- 148 -

Nebraska Supreme Court Advance Sheets
301 Nebraska Reports
CITY OF SIDNEY v. MUNICIPAL ENERGY AGENCY OF NEB.
Cite as 301 Neb. 147

9. ____: ____. Substantial performance is shown when the following circumstances are established by the evidence: (1) The party made an honest endeavor in good faith to perform its part of the contract, (2) the results of the endeavor are beneficial to the other party, and (3) such benefits are retained by the other party.

10. ____: ____. Substantial performance is a relative term, and whether it exists is a question to be determined in each case with reference to the existing facts and circumstances.

11. **Appeal and Error.** An appellate court is not obligated to engage in an analysis which is not needed to adjudicate the controversy before it.

Appeal from the Public Power Review Board. Reversed.

John M. Guthery, Derek A. Aldridge, and Richard D. Sievers, of Perry, Guthery, Haase & Gessford, P.C., L.L.O., for appellant.

Stephen M. Bruckner and Alexander D. Boyd, of Fraser Stryker, P.C., L.L.O., for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, and Funke, JJ.

Funke, J.

This is an appeal from an arbitration board's decision under Neb. Rev. Stat. § 70-1301 et seq. (Reissue 2009). The City of Sidney, Nebraska, initiated this dispute against its wholesale energy provider, Municipal Energy Agency of Nebraska (MEAN), regarding its monthly transmission rate charges. The board ruled that MEAN breached the parties' "Service Schedule M" (SSM) supplemental agreement, by unnecessarily and unilaterally changing the transmission path for the electric power and energy it provided to Sidney and by charging Sidney for the increased transmission rates. Because of these breaches, the board ruled that the transmission rate MEAN charged Sidney was excessive, unfair, and unreasonable.

On our de novo review, we conclude that the increased monthly transmission rate charges were not incurred arbitrarily

- 149 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
301 NEBRASKA REPORTS
CITY OF SIDNEY v. MUNICIPAL ENERGY AGENCY OF NEB.
Cite as 301 Neb. 147

by MEAN but, instead, were required for continued performance of the SSM, after the parties learned they had insufficient contractual rights to complete the transmission path to Sidney. We hold that MEAN substantially complied with the SSM in transmitting energy to Sidney and that MEAN was permitted to charge Sidney the increased transmission rate under the SSM. Therefore, we reverse the decision of the arbitration board.

## I. BACKGROUND

### 1. RELEVANT ENTITIES

Sidney is a political subdivision and the operator of the retail electric system within its municipality and Fort Sidney, which serves approximately 3,900 customers. Sidney's peak energy need ranges from 12 megawatts (MW) in the winter to 18.5 MW in the summer.

MEAN is a Nebraska political subdivision and a not-for-profit wholesale energy provider, created under Nebraska's Municipal Cooperative Financing Act.[1] It is composed of over 60 member communities—in Nebraska, Iowa, Colorado, and Wyoming—who have signed an Electrical Resources Pooling Agreement, which is the master agreement that governs all supplemental contracts between the parties. MEAN supplies its members' wholesale energy by contracting for generation rights, with other members and third-party energy providers, and transmission rights, with third-party transmission service providers. MEAN is governed by a board of directors and a management committee, both of which consist of appointed representatives from each member community.

MEAN has served as Sidney's primary wholesale energy supplier since 1982. At all relevant times, MEAN has served Sidney's energy needs through the Sidney West switchyard (Sidney West). Sidney West is composed of several substations

---

[1] Neb. Rev. Stat. § 18-2401 et seq. (Reissue 2012).

and facilities owned by different entities: The Western Area Power Administration (WAPA) owns a substation containing its 115 kilovoltage (kV) bus and attached transmission lines; Sidney owns transmission lines and a 115 kV/13.2 kV transformer, which are located within WAPA's substation and connect to the national power grid only through WAPA's 115 kV bus; and Tri-State Generation and Transmission Association, Inc. (Tri-State), owns a substation containing a 230 kV bus, a 230 kV/115 kV transformer, and transmission lines connecting its bus and transformer to WAPA's 115 kV bus.

WAPA is a federal power marketing administration within the U.S. Department of Energy. WAPA allocates federally generated hydroelectric energy to municipalities and other political subdivisions. WAPA also operates as a wholesale energy provider and transmission service provider, through its Loveland Area Project (LAP) Network Integrated Transmission System (NITS). Additionally, WAPA contracts with other transmission service providers as a tariff administrator to ensure compliance with Federal Energy Regulatory Commission regulations and monitor electronic tag (e-tag) registration in "OASIS," the electronic system for registering transmission paths and scheduling energy transmissions across those paths. E-tags are electronic transaction records that document the planned flow of energy across one or more transmission systems in the wholesale market.

The Missouri Basin Power Project (MBPP) owns the Laramie River Station (LRS), a power-generating company, and transmission lines used to transmit energy from LRS. One of the owners of MBPP is Basin Electric Power West (BEPW). Through a displacement agreement with BEPW, MEAN has rights to 18 MW of energy from LRS and MBPP's transmission lines connecting to Sidney. The displacement agreement makes WAPA the tariff administrator for BEPW and MEAN regarding their transmissions on the MBPP system.

## 2. CONTRACTUAL RELATIONSHIP
### BETWEEN SIDNEY AND MEAN

In 1995, Sidney accepted bids for its wholesale energy needs and resolicited bids in 1996. During the 1996 bid solicitation, MEAN's bid tied for the lowest, and Sidney chose to award MEAN the contract because of the parties' long history and Sidney's ability to participate in MEAN's governance, as a member community. From 1996 until 2001, Sidney and MEAN entered into a series of short-term supplemental agreements, under which MEAN provided Sidney its energy requirements in excess of WAPA's approximately 2 MW energy allocation to Sidney.

After winning the bid in 1996, MEAN and Tri-State entered into the "Sidney Facilities Service Agreement" (Tri-State Agreement), which enabled MEAN to transmit 7 MW of energy through the portions of Sidney West "own[ed], operate[d], and maintain[ed]" by Tri-State for $2,367.40 per month, with the option to increase the capacity at the cost of $338.18 for each of the MW transmitted per month. With this agreement, MEAN was able to transmit LRS-generated energy to Sidney through MBPP, which connects to Sidney West at Tri-State's 230 kV bus.

In 2005, MEAN's manager of electric operations was contacted by WAPA concerning the transmission arrangement MEAN used to serve Sidney. He informed WAPA that MEAN served Sidney using Tri-State's transformer, under the Tri-State Agreement, which he believed WAPA found acceptable. He later informed Sidney that if Sidney could no longer rely solely on the Tri-State Agreement for its energy transmission, then Sidney would have to be put on WAPA's LAP NITS for transmission at a nearly $300,000 annual transmission rate increase.

In 2007, MEAN's manager of electric operations encouraged Sidney to enter into the SSM, instead of continuing with its then-current supplemental agreement, ending in 2011. He

- 152 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
301 NEBRASKA REPORTS
CITY OF SIDNEY v. MUNICIPAL ENERGY AGENCY OF NEB.
Cite as 301 Neb. 147

explained several benefits of the SSM to Sidney: long-term energy rate stability, saving Sidney over $100,000 in 2008 alone for its current agreement; savings of more than $1.6 million in 2008, compared to full tariff service with Tri-State; and extending Sidney's long-term relationship with MEAN as a participating member in MEAN's governance. He also stated that Sidney's energy rates were lower than other MEAN members, in part because of the low transmission costs enabled by the Tri-State Agreement.

In 2008, the parties entered into the SSM, effective from February 1, 2008, until at least 2041. The SSM is a standard form agreement used with other members of MEAN and includes attachments specific to the member community. It requires MEAN to provide Sidney its energy requirements, less WAPA allocations, and Sidney to pay MEAN for such energy under the provisions of exhibit B, the rate schedule. The SSM also states that the energy supplied by MEAN shall be delivered to the "Point of Delivery" (POD) specified in exhibit A, which may be modified only "by a revised Exhibit A signed by an authorized officer of [Sidney] and accepted by MEAN."

Exhibit A includes the following diagram:



D = Point of Delivery

- 153 -

Nebraska Supreme Court Advance Sheets
301 Nebraska Reports
CITY OF SIDNEY v. MUNICIPAL ENERGY AGENCY OF NEB.
Cite as 301 Neb. 147

From 1996 until December 1, 2014, under each of the parties' supplemental agreements, MEAN provided Sidney's energy requirements through its generation rights in LRS and transmission rights on MBPP's transmission lines, which connected to Sidney's facilities in Sidney West through Tri-State's and WAPA's facilities. The only fee for transmission charged to Sidney by MEAN under this transmission path was the $2,367.40-per-month base fee in the Tri-State Agreement.

### 3. Policy Changes Regarding
### Energy Transmissions

#### (a) MEAN Policy Changes

In 2013, MEAN entered into a settlement with the Southwestern Power Pool to compensate it for MEAN's unreserved use of its facilities, which is the use of a facility to transmit energy without any contractual rights to do so. Tariff administrators establish the penalties for unreserved use of facilities, which generally include compensating the owner of the facility for any use at double the rate normally charged. MEAN's board of directors decided to pay the costs of this settlement by socializing the amount across all of its members, even though Sidney and other members had not directly benefited from the unreserved use.

In response to the incident with the Southwestern Power Pool, MEAN's executive director proposed a directive implementing a culture of compliance for MEAN to the board of directors, which it approved. Consequently, there was an expectation that MEAN would do whatever was necessary to comply with all regulations. By 2013, MEAN had begun extensively reviewing energy contracts to ensure they were complying with applicable regulations.

#### (b) WAPA Changes to Use of
#### E-Tags on MBPP Lines

As Sidney's energy provider, MEAN scheduled all e-tags for the transmission of its generated energy resources to

- 154 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
301 NEBRASKA REPORTS
CITY OF SIDNEY v. MUNICIPAL ENERGY AGENCY OF NEB.
Cite as 301 Neb. 147

Sidney on OASIS. Historically, e-tags were very general in that MEAN was required to specify only the start and end points of an entire transmission path and label it as grandfathered.

In January 2013, however, WAPA informed MEAN that it intended to discontinue the use of grandfathered e-tags effective March 26, 2013. As a result, MEAN was now required to schedule each transmission segment along the complete path through specific e-tags. These specific e-tags were required to specify the start and end points of each transmission segment, the transmission service provider that owned the segment, and the capacity level of the energy. The capacity level of energy is rated on a 1-to-7 scale. Level 7 is the highest priority, the last level to be curtailed in the case of overscheduling, classified as "firm" capacity.

OASIS rejects a registered e-tag if there is insufficient capacity on a particular segment of the transmission line or if it does not recognize the registering entity as having a contractual right for its scheduled transmission. Conversely, when an entity had used a grandfathered e-tag, OASIS' system for verifying whether the registering entity had sufficient contractual rights to transmit energy across each segment of a complete transmission path was bypassed.

Upon announcing the change, Raymond Vojdani, a transmission policy advisor at WAPA, informed MEAN that its transmission capacity on the MBPP line to Sidney West would be reduced to 4 MW of firm capacity, from the 18 MW of firm capacity available with the grandfathered e-tag. Vojdani also suggested that MEAN's transmission path to Sidney, under the displacement agreement, would consist of the following three segments: the LRS generating facility to the MBPP transformer converting energy to 230 kV, BEPW LRS>LRS 230; MBPP's transformer to the Stegall, Nebraska, switchyard, LAPT LRS 230>SGW; and the Stegall switchyard to Sidney West, BEPW SGE>SCSW.

#### 4. MEAN's Internal Response
#### to WAPA's Changes

In December 2013, MEAN internally discussed a problem with its transmission path for Sidney within Sidney West. MEAN found that the three-segment path, provided by Vojdani, was insufficient to deliver energy to Sidney, because it resulted in a gap within Sidney West, and that it could only create a complete transmission path by adding a fourth segment, LAPT SCSW>SCSW. "LAPT" referred to the Loveland Area Power Transmission, which encompassed WAPA's 115kV bus located within Sidney West.

Rather than scheduling transmissions to Sidney with this fourth segment, MEAN used point-to-point transmission capacity (PtP) to create a complete transmission path. PtP is the purchase of transmission rights for a single segment of a transmission system, but it must be purchased for the peak MW capacity required at any point regardless of whether or not the entity needs such capacity at all times. MEAN relied on 10 MW of its existing organizational PtP and acquired additional PtP at a cost of over $30,000 in 2013 and 2014.

MEAN initially attributed the gap in its transmission path to Tri-State's 230 kV/115 kV transformer. They asked Vojdani whether a Tri-State-to-Sidney West, TSGT SCSW>SCSW, e-tag could be created, under the Tri-State Agreement, to resolve the gap, but Vojdani stated that no e-tag across Sidney West should be required, because all parties were aware of MEAN's agreement to use Tri-State's 230 kV/115 kV transformer. During this same period, Billy Cutsor, a MEAN employee, provided Vojdani with incorrect information regarding the number of MW MEAN could transmit through Tri-State's facilities, under the Tri-State Agreement. Based upon the incorrect information, Vojdani recommended that Sidney be placed on LAP NITS so that MEAN could transmit a sufficient amount of energy to Sidney to fulfill Sidney's needs. After this recommendation, MEAN targeted placing Sidney on LAP NITS on October 1, 2014.

- 156 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
301 NEBRASKA REPORTS
CITY OF SIDNEY v. MUNICIPAL ENERGY AGENCY OF NEB.
Cite as 301 Neb. 147

Still having issues with creating a complete transmission path to Sidney, MEAN contacted Tri-State in February 2014. Tri-State offered various e-tag alternatives, but each proved ineffective. Tri-State suggested using the TSTG SGW>SCSW 230 e-tag, but it did not work, because it contained the same gap within Sidney West. MEAN requested that Tri-State fill the gap in its path by creating an e-tag representing its contractual rights under the Tri-State Agreement, suggesting TSTG SCSW 230>SCSW 115, but this also did not work.

Tri-State then suggested using the LAPT SCSW>SCSW e-tag. However, MEAN expressed concern that this e-tag would indicate it was using WAPA's system, which Vojdani confirmed. Subsequently, MEAN, Tri-State, and Vojdani scheduled a conference call to discuss the e-tag issue further. Based on the call, MEAN concluded that WAPA's 115 kV bus was the gap in its transmission path to Sidney and that it would need to contract with WAPA to create a complete transmission path using WAPA's bus.

In June 2014, MEAN began working on an application to WAPA to determine whether there was sufficient capacity on LAP NITS to serve Sidney's energy needs. MEAN submitted its application to WAPA on July 21.

### 5. MEAN COMMUNICATIONS
#### WITH SIDNEY AND CHANGE
#### TO TRANSMISSION PATH

In the spring of 2014, Cutsor mentioned to a Sidney employee that some issues had arisen with the transmission arrangement MEAN used to serve Sidney, explaining what had changed and some options for solving the issue. Then, in July 2014, Cutsor sent an email to another Sidney employee explaining that the use of e-tags had recently become more transparent, that the Federal Energy Regulatory Commission now monitored e-tags, and that a complete transmission path to Sidney would require additional transmission service. Cutsor recommended that Sidney obtain LAP NITS and cancel the

- 157 -

Nebraska Supreme Court Advance Sheets
301 Nebraska Reports
CITY OF SIDNEY v. MUNICIPAL ENERGY AGENCY OF NEB.
Cite as 301 Neb. 147

Tri-State Agreement effective October 1, 2014, which would result in about a $500,000 annual increase in transmission fees. During a subsequent conference call in July, MEAN communicated that WAPA would not impose any penalty for the unreserved use of its facilities if Sidney obtained LAP NITS service by October 1.

In August 2014, MEAN provided Sidney with a price comparison for Tri-State and LAP NITS, the only entities with substations at Sidney West. MEAN determined that the use of LAP NITS would cost $576,000 per year and that full tariff service with Tri-State would cost about $630,000 per year. Sidney responded that it would be examining its options further before accepting MEAN's proposal. Later, MEAN informed Sidney that Tri-State's full tariff service would not include rights to WAPA's 115 kV bus and that WAPA offered only full tariff service on LAP NITS, not a limited contract for the 115 kV bus only.

Both MEAN and WAPA estimated that keeping the existing transmission path with MBPP and adding PtP to transmit energy across WAPA's bus would be a similar or higher cost than obtaining LAP NITS full tariff service. Further, PtP would be subject to curtailing when there was insufficient capacity on WAPA's 115 kV bus and would continue to provide Sidney with only 4 MW firm energy. Conversely, WAPA informed MEAN that as part of the full tariff service with LAP NITS, Sidney could be provided with its full energy needs at firm capacity by WAPA's generating sources. MEAN also learned from WAPA that LAP NITS could transmit energy to Sidney independent of the rights in the Tri-State Agreement and over various lines, which would reduce the risk of interruptions.

During a meeting in September 2014, MEAN discussed with Sidney the changes in 2013 that led to the identification of the gap in the transmission path, how the Tri-State Agreement was insufficient to close the gap, and its final

determination that obtaining LAP NITS and canceling the Tri-State Agreement, effective October 1, 2014, would be the best option to provide Sidney a complete transmission path. Sidney, however, refused to accept any rate change until 60 days after MEAN provided it notice pursuant to the correct SSM procedure. The next week, MEAN advised Sidney regarding the use of "non-firm" energy transmission and the higher costs of doing so with PtP and explained how LAP NITS costs were calculated.

On September 25, 2014, MEAN sent formal notice to Sidney of its intent to implement the changes, which would affect Sidney's transmission charges, on December 1. On that same day, MEAN sent a notice to Tri-State terminating the Tri-State Agreement, effective as of December 1.

In October 2014, WAPA informed MEAN that WAPA could have charged Sidney for the unreserved use of its 115 kV at double the rate going back several years but opted not to do so. WAPA also informed MEAN that it would provide an initial discount to Sidney for obtaining LAP NITS.

Effective December 1, 2014, Sidney's energy needs began being served by LAP NITS. Due to a billing error, MEAN did not start billing Sidney for the LAP NITS charges until March 2015. Over the next 12 months, WAPA phased in the increased costs for Sidney's service on LAP NITS. Once the full charges for LAP NITS were phased in, Sidney's transmission costs had increased from $28,408.80 per year to approximately $576,000 per year.

After Sidney was placed on LAP NITS, WAPA took over the scheduling of e-tags to transmit energy to Sidney. According to an unexecuted contract between MEAN and WAPA and communications with WAPA, MEAN concluded that WAPA schedules Sidney's energy through the Archer, Nebraska, switchyard, which connects directly to WAPA's 115 kV bus in Sidney West. However, LAP NITS connects to Sidney West with four different transmission sources, two of which connect to Tri-State's 230 kV bus.

- 159 -

Nebraska Supreme Court Advance Sheets
301 Nebraska Reports
CITY OF SIDNEY v. MUNICIPAL ENERGY AGENCY OF NEB.
Cite as 301 Neb. 147

### 6. Proceedings Before
### Arbitration Board

In early 2015, Sidney sent MEAN a notice of election to dispute charges, under § 70-1304. The parties failed to settle the dispute, and arbitration proceedings were initiated, under § 70-1306. Sidney filed an amended notice at the first meeting with the arbitration board that alleged MEAN had breached the SSM by charging an unfair, unreasonable, and discriminatory transmission rate; the SSM by unilaterally changing the POD; and the implied covenant of good faith and fair dealing by acting in a manner that injured Sidney. The arbitration proceedings occurred in March 2017.

### (a) Transmission Gap in Sidney West

MEAN called several of its employees to testify about the gap in the transmission path identified in Sidney West. The employees testified that they had concluded WAPA's 115 kV bus was the gap in the transmission path at Sidney West. MEAN staff admitted that neither WAPA nor the Federal Energy Regulatory Commission had threatened to penalize Sidney or MEAN for unreserved use of WAPA's facilities. However, they stated that MEAN had to obtain contractual rights to use WAPA's bus, because using WAPA's bus without a contract violated the regulatory commission's regulations and MEAN's culture-of-compliance directive. They also testified that once Vojdani became aware of the issue, he acknowledged that WAPA could have penalized MEAN for its unreserved use of WAPA's facilities but would not do so if Sidney obtained sufficient rights.

Sidney called an expert who testified that there was no gap in the transmission path MEAN had been using to serve Sidney, because "[b]us transfers are not charged for in general . . . ." MEAN's expert agreed that the bus did not create a gap in transmission service by stating that the convention in the "west" is that there is no charge for energy crossing a substation if it enters and exits at the same voltage, as a professional

- 160 -

Nebraska Supreme Court Advance Sheets
301 Nebraska Reports
CITY OF SIDNEY v. MUNICIPAL ENERGY AGENCY OF NEB.
Cite as 301 Neb. 147

courtesy. Instead, he stated that an entity has to pay only for the use of a transformer to change voltage levels, which generally covers the expense of going across a bus.

MEAN's expert also acknowledged that there was no path for WAPA's Sidney West facilities posted on OASIS. Pursuant to the Federal Energy Regulatory Commission regulations, all transmission paths are to be registered on OASIS along with the total transfer capability and the available transfer capability. However, MEAN's expert qualified his statement by stating that only line segments needed to be registered. Additionally, Vojdani testified that LAP NITS would include access to transmission facilities like its 115 kV bus.

Vojdani testified that WAPA first became aware of a problem with MEAN's transmission path to Sidney in February 2014, as a result of MEAN's questions regarding its problems with its transmission path. Vojdani stated that at that time, he realized WAPA's 115 kV bus was the last segment of the transmission path to Sidney and that WAPA needed to be compensated for the use of its bus, because the Tri-State Agreement did not provide such a right. He testified that he informed MEAN of this during the February 2014 conference call with MEAN and Tri-State staff. Vojdani also stated that WAPA considered penalizing MEAN for its unreserved use of WAPA's 115 kV bus but decided not to do so.

### (b) Compliance With Exhibit A

Sidney employees provided testimony regarding their understanding of exhibit A and MEAN's actions in placing Sidney on LAP NITS. They testified that the favorable and stable transmission rate provided by MEAN under the Tri-State Agreement was a primary motivation in Sidney's entering the SSM. Sidney employees testified that they believed exhibit A represented a contractual requirement that MEAN transmit Sidney's energy through the MBPP line and the Tri-State facilities, under the Tri-State Agreement. They also stated that Sidney never consented to amending exhibit A and

that MEAN unilaterally decided to place Sidney on LAP NITS and cancel the Tri-State Agreement, without providing Sidney with any alternative options.

Sidney's expert testified that the POD in exhibit A was located at the fence of Tri-State's substation at Sidney West on the MBPP line and that MEAN was in breach of exhibit A because WAPA had no right to deliver energy on MBPP's line. He stated that typically, a transmission line owned by one entity would connect to a transmission line at the fence line of another entity's facilities so that the first entity would not have to enter the second's facilities to service its transmission line. The expert acknowledged that the diagram of Sidney West in evidence did not show a change in line ownership at the fence line to Tri-State's substation but explained that it was likely because the diagram was created by WAPA and not Tri-State or MBPP.

MEAN's expert testified that MEAN had not breached exhibit A, because the POD was Tri-State's 230 kV bus and LAP NITS had transmission lines connecting to the bus and rights to transmit energy through it. He explained that a POD is the end point of transmission service and is generally an entire substation but, occasionally, a bus if there is an internal voltage transfer within a substation. The expert, and Vojdani, testified that a POD cannot be located on a transmission line itself, because energy cannot be forced to travel along a specific path; instead, energy travels on the path of least resistance, which could be any transmission line regardless of ownership. Sidney's expert contested that WAPA did not have the ability to transmit energy to serve Sidney across Tri-State's transformer.

MEAN staff detailed their several communications with Sidney staff regarding the issue and recommending the option it had determined would be the most cost-effective solution, discussed above. They also detailed the price comparisons that they had made, and shared with Sidney staff, in reaching their conclusion regarding the most cost-effective solution.

MEAN's expert agreed with the recommendation of MEAN staff that the lowest cost option for Sidney was being placed on LAP NITS and canceling the Tri-State Agreement.

### (c) Charges Under LAP NITS

MEAN staff testified that under the SSM, transmission charges are to be passed through to the customer at the cost charged by the third party. They admitted that as of the hearing, MEAN still had not executed an agreement with WAPA placing Sidney on LAP NITS, but that Sidney was receiving and being charged for energy and transmission on LAP NITS. They explained that WAPA charges customers based on the number of MW transferred through LAP NITS, not by the distance energy is transmitted.

MEAN staff testified that WAPA calculated the charges for all of MEAN's members under the same formula and passed the single charge to MEAN. They testified that MEAN then used the same formula as WAPA to determine each of its community's charges, which it passed on to each community without markup. MEAN staff stated that Sidney's transmission costs for using LAP NITS are about 10 percent of its total energy costs, which is the same average transmission cost ratio for all 54 of MEAN's members with an SSM agreement. MEAN staff also testified that Sidney's transmission costs under the Tri-State Agreement alone were extremely low, amounting to transmission costs of less than 1 percent of total energy costs.

### 7. ARBITRATION BOARD'S DECISION

The arbitration board concluded that MEAN breached the SSM because it had unilaterally changed the POD and charged Sidney the increased transmission rate. Consequently, it ruled that the transmission rate MEAN was charging Sidney for electric wholesale service to Sidney was excessive, unfair, and unreasonable. The board ruled that it was not authorized to terminate or rescind the SSM, under § 70-1314, so it set the fair, reasonable, and nondiscriminatory rate for

- 163 -

Nebraska Supreme Court Advance Sheets
301 Nebraska Reports
CITY OF SIDNEY v. MUNICIPAL ENERGY AGENCY OF NEB.
Cite as 301 Neb. 147

transmission charges at $2,367.40 per month, the rate charged before MEAN's breach. The board did not make any finding regarding the alleged breach of the implied covenant of good faith and fair dealing.

The board ruled that the POD in exhibit A was located on the MBPP line at the fence of the Tri-State substation and that MEAN had breached exhibit A, because WAPA had no rights on the MBPP line, could not use Tri-State's transformer to serve Sidney, and served Sidney from the Archer switchyard at 115 kV. It found that MEAN changed the path without consulting with Sidney and that Sidney did not consent to the change.

The board determined that MEAN's breach of exhibit A damaged Sidney because changing the transmission path was unnecessary. It ruled there was no gap in the transmission path to Sidney by making the following findings: The transmission path had been sufficient before December 2014, and neither WAPA nor the Federal Energy Regulatory Commission required the change; both parties' experts testified that there was no cost to use WAPA's bus; and the evidence showed that Tri-State had the right to use WAPA's 115 kV bus at no charge. The board determined that the entirety of Vojdani's testimony was not entitled to weight, because it was partially based on incorrect facts from Cutsor.

The board also ruled that MEAN breached the SSM's requirement that it charge Sidney energy rates that were fair, reasonable, and nondiscriminatory. It determined that the rate was unfair, because it interpreted the SSM to require MEAN to contract for a complete transmission path to Sidney at its own expense, and discriminatory, because MEAN's board of directors inconsistently socialize transmission costs.

MEAN appealed the decision of the arbitration board to the Nebraska Court of Appeals, under § 70-1326. We then granted MEAN's petition to bypass the Court of Appeals.[2]

---

[2] See Neb. Rev. Stat. § 24-1106(2) (Supp. 2017).

## II. ASSIGNMENTS OF ERROR

On appeal, MEAN assigned—reordered, restated, and consolidated—that the arbitration board erred in (1) concluding that it had subject matter jurisdiction to hear breach of contract claims; (2) allowing Sidney to amend its notice of dispute; (3) finding WAPA's facilities did not create a "'gap'" in the transmission path to Sidney, because they could be used without charge; (4) finding LAP NITS was unnecessary and not the lowest cost alternative to transmit energy to Sidney; (5) finding that MEAN breached the SSM by changing the POD; (6) finding that MEAN breached the SSM by passing unfair, unreasonable, and discriminatory transmission charges to Sidney; (7) receiving exhibit 100 into evidence; and (8) altering and modifying the parties' contract in setting the fair, reasonable, and nondiscriminatory rate for transmission service.

## III. STANDARD OF REVIEW

[1,2] On an appeal from the decision of an arbitration board convened under § 70-1301 et seq., trial in the appellate court is de novo on the record.[3] Despite our de novo review, when credible evidence is in conflict on material issues of fact, the appellate court will consider and may give weight to the fact that the arbitration board observed the witnesses and accepted one version of the facts over another.[4]

## IV. ANALYSIS

### 1. ARBITRATION BOARD HAD
### SUBJECT MATTER JURISDICTION

MEAN argues the arbitration board, as a statutorily created body, lacked subject matter jurisdiction to decide Sidney's contract-based claims. Instead, it argues the statutes expressly limit the arbitration board's jurisdiction to deciding rate dispute

---

[3] § 70-1327; *In re Application of Northeast Neb. Pub. Power Dist.*, 300 Neb. 237, 912 N.W.2d 884 (2018).

[4] *Id.*

- 165 -

Nebraska Supreme Court Advance Sheets
301 Nebraska Reports
CITY OF SIDNEY v. MUNICIPAL ENERGY AGENCY OF NEB.
Cite as 301 Neb. 147

claims by determining whether the rate charged is adequate, fair, reasonable, and nondiscriminatory.

[3] We recently considered whether an arbitration board, created under § 70-1301 et seq., had jurisdiction to consider breach of contract and breach of an implied covenant of good faith and fair dealing claims, in *In re Application of Northeast Neb. Pub. Power Dist.*[5] We stated that "[t]he Legislature clearly contemplated the existence of power contracts" in the statutes and that rate disputes are often intertwined with contractual issues of the rights and obligations regarding the rate.[6] Accordingly, we held that where "contractual issues are intertwined with a rate dispute, such contractual issues are within the arbitration board's jurisdiction."[7]

Section 70-1302 explicitly states that a board's authority to "resolve wholesale electric rate disputes [includes] rate disputes relating to transmission and delivery of electrical energy." Therefore, the board had subject matter jurisdiction to consider whether MEAN breached the SSM or the implied covenant of good faith and fair dealing to the extent that such breaches resulted in transmission rate charges that are unfair, unreasonable, and discriminatory.

## 2. Arbitration Board Did Not Err in Allowing Sidney to File Amended Notice

MEAN contends that the arbitration board erred in allowing Sidney to file an amended notice, because § 70-1301 et seq. does not provide a mechanism for amending a notice of dispute.

When a purchaser elects to dispute a wholesale electric charge, § 70-1304 requires that the purchaser "shall give notice in writing to the supplier stating such election. The

---

[5] *In re Application of Northeast Neb. Pub. Power Dist., supra* note 3.

[6] *Id.* at 248, 912 N.W.2d at 892.

[7] *Id.*

- 166 -

Nebraska Supreme Court Advance Sheets
301 Nebraska Reports
CITY OF SIDNEY v. MUNICIPAL ENERGY AGENCY OF NEB.
Cite as 301 Neb. 147

notice shall fully describe the basis for the dispute and set forth a detailed statement of disputed issues and the relief sought by the purchaser." Section 70-1318 states that "[t]he arbitration board shall be bound by the rules of evidence applicable in district court." Section 70-1306 provides the default procedural rules governing the arbitration, stating, in part, the following:

> Except as otherwise provided in sections 70-1301 to 70-1329, the Commercial Arbitration Rules of the American Arbitration Association, as amended and in effect March 1, 1977, shall be used to the extent that they are determined by the arbitration board to be applicable to the procedures set forth in sections 70-1301 to 70-1329.

The Commercial Arbitration Rules address the ability of a party to amend its claim, or notice in this case. Rule R-6(b) provides that "[a]fter the arbitrator is appointed, . . . no new or different claim may be submitted except with the arbitrator's consent."[8] This provision's grant of authority to the arbitrator to allow substantive changes to the claims before him or her necessarily includes the lesser power to permit nonsubstantive changes.

[4] Section 70-1301 et seq. does not otherwise provide for amendments of a notice or prohibit such. Accordingly, we find that under § 70-1306, an arbitration board is authorized to permit amendments to a notice, substantive or not, at any time in the arbitrative proceedings.

At the arbitration board's first meeting, the board ruled that the Commercial Arbitration Rules would be inapplicable regarding the rules of evidence but made no similar ruling regarding procedural matters. Sidney later moved to file an amended notice of election to dispute, and the board considered whether the arbitration rules would permit Sidney to amend its notice. The arbitration board ultimately found that it

---

[8] American Arbitration Association, Commercial Arbitration Rules and Mediation Procedures R-6(b) at 13 (Oct. 1, 2013).

- 167 -

Nebraska Supreme Court Advance Sheets
301 Nebraska Reports
CITY OF SIDNEY v. MUNICIPAL ENERGY AGENCY OF NEB.
Cite as 301 Neb. 147

had the power to allow Sidney to amend its notice and ruled that Sidney could, after concluding that the issues presented in the amended notice were not a substantial deviation from those in the original notice.

Because the arbitration board had the authority to allow Sidney to amend its notice and did allow the amendment, this assignment of error is without merit.

### 3. Sidney's Claims

The board did not consider Sidney's implied covenant of good faith and fair dealing claim. In addition, Sidney did not file a motion for rehearing or a cross-appeal on this issue, so we do not consider it.

Sidney's breach of contract claims, in the limited context of this dispute, depend on showing that MEAN's breach resulted in an unfair, unreasonable, or discriminatory rate. The board determined that there was no gap in the transmission path serving Sidney, so it ruled that MEAN's unilateral and unnecessary change to the transmission path, in breach of exhibit A, was unfair to Sidney to the extent that it increased Sidney's transmission rate. The board also found that the rate increase to Sidney was unfair because the SSM required MEAN to bear that expense and discriminatory because MEAN inconsistently socialized transmission costs. Upon our de novo review, we find that the arbitration board erred in its ultimate conclusions on the breach of contract claims and certain underlying factual findings.

### (a) MEAN's Change to Transmission Path Substantially Complied With Exhibit A

#### (i) MEAN Could Not Transmit Energy Across WAPA's Facilities Without Contractual Rights

The crux of this claim is whether WAPA's 115 kV bus constituted a gap in the transmission path serving Sidney. As the

- 168 -

Nebraska Supreme Court Advance Sheets
301 Nebraska Reports
CITY OF SIDNEY v. MUNICIPAL ENERGY AGENCY OF NEB.
Cite as 301 Neb. 147

arbitration board found, if there was no gap, then MEAN's action of placing Sidney on LAP NITS was unnecessary. However, if there was a gap, at least some additional cost was required for performance of the SSM.

MEAN contends that the arbitration board erred in determining WAPA's facilities did not constitute a gap in the transmission path. It contends that Vojdani testified to telling MEAN that MEAN could not transmit energy across WAPA's 115 kV bus without contractual rights to do so and that the Tri-State Agreement did not provide such rights. Further, it argues that the fact that WAPA had not charged for the usage of its facilities in the past did not preclude it from penalizing for that unreserved use or charging for any future use.

Sidney contends that there was no gap in the transmission path. It argues that MEAN staff admitted that a complete transmission path could be created with the LAPT SCSW>SCSW e-tag, which proved that the Tri-State Agreement itself provided MEAN the right to use WAPA's facilities and that no charge was necessary—based on both experts' testimony. Sidney also argues that the board found Vojdani's testimony was not entitled to weight, because it was based on the incorrect information about the Tri-State Agreement provided to him by Cutsor.

We disagree with Sidney and the arbitration board that Vojdani's testimony was not entitled to weight. Vojdani testified there were two *independent* bases for placing Sidney on LAP NITS: (1) MEAN had insufficient firm capacity on the MBPP line and insufficient total capacity on the Tri-State facilities to serve Sidney, and (2) MEAN had no right to transmit energy across WAPA's 115 kV bus. Vojdani's testimony regarding insufficient capacity on the Tri-State facilities was clearly based on erroneous information from Cutsor. However, as Cutsor acknowledged, that incorrect information had no relevance to Vojdani's determination that MEAN lacked any right to transmit energy across WAPA's bus. Accordingly, we find that Vojdani's testimony regarding

such is entitled to significant weight based on his employment with WAPA.

The communications between MEAN, Tri-State, and WAPA while troubleshooting the transmission issue and the testimony of MEAN staff also support a conclusion that the WAPA bus constituted a gap in the transmission path. Vojdani and MEAN staff testified that they were unaware of any contractual insufficiency in the transmission path to Sidney before the grandfathered e-tag was discontinued. After grandfathered e-tags were discontinued, however, the evidence shows MEAN was unable to complete a transmission path without relying on PtP or the LAPT SCSW>SCSW e-tag.

While MEAN initially believed the gap was caused by Tri-State's transformer, its understanding evolved as a result of Tri-State's being unable to offer any solution to the gap other than recommending MEAN use the LAPT SCSW>SCSW e-tag, which Vojdani confirmed would express a contractual right to use WAPA's bus. On a conference call to discuss the issue further, Vojdani informed MEAN that it could not schedule a complete transmission path to Sidney without using WAPA's 115 kV bus and that MEAN had no contractual right to do so. MEAN staff testified that they obtained LAP NITS for Sidney to acquire the right to transmit energy to Sidney across WAPA's 115 kV bus.

The board discounted Cutsor's testimony that the WAPA bus was the gap in transmission service, because he also testified that the gap was the Tri-State transformer. This statement, however, stood in contradiction to his identification of the WAPA bus as the gap during at least two other portions of his testimony and his description of the development of his understanding regarding the gap.

Sidney argues that Tri-State's suggestion that MEAN use the LAPT SCSW>SCSW e-tag was either an acknowledgment that the Tri-State Agreement assigned MEAN a license to use WAPA's facilities or that the suggestion itself assigned MEAN the right to do so. The Tri-State Agreement, however,

provides MEAN a right to use only those facilities that Tri-State "owns, operates, and maintains." There is no language granting or assigning any right to use WAPA's facilities at Sidney West or even mentioning WAPA. Additionally, Tri-State's suggestion that MEAN schedule its transmissions on WAPA's facilities cannot be construed as a contractual assignment of any right that Tri-State may have had.

Both MEAN's and Sidney's experts testified that transmitting energy across a bus at the same voltage level is *generally* not charged for as a professional courtesy in the "west" region of the country. However, neither expert claimed to do any work or to have specific knowledge of the customs in the Rocky Mountain region, where the parties and the relevant division of WAPA are located. Accordingly, regardless of the accuracy of these statements, they provide no insight regarding WAPA's policies, as a tariff administrator, concerning the use of facilities at the same voltage level or WAPA's practices, as a transmission service provider, in charging for the use of its own facilities. In addition, Vojdani explicitly testified that the transmission across its facilities to serve Sidney at Sidney West would require a contractual right and compensation to do so. This testimony was uncontested and more persuasive than the experts' generalities.

Sidney also argues that WAPA's 115 kV bus is not an asset that WAPA can charge for the use of, because the bus was not a posted path on OASIS. The arbitration board agreed that the failure to list the bus as a posted path was inconsistent with the claim that WAPA could charge for the use of the bus. However, MEAN's expert qualified his testimony on this subject by stating that registering the available transfer capability is applicable only to line segments. We also find the limited testimony on this issue contradicted by the undisputed testimony that WAPA had registered the LAPT SCSW>SCSW e-tag.

Based on the preceding evidence, we conclude, on our de novo review, that there was a gap in the transmission path

serving Sidney's energy at the WAPA 115 kV bus and that it was necessary for MEAN to acquire contractual rights for any future use.

We reject Sidney's attempt to fault MEAN for acting in compliance with federal regulations that prohibit the unreserved use of transmission facilities. While it is undisputed that MEAN alerted WAPA to its unreserved use of WAPA's facilities, MEAN did so in a good faith attempt to obtain a valid transmission path to serve Sidney. The actions of MEAN staff were also motivated by the directive of MEAN's board of directors, which Sidney is represented upon, implementing a culture of compliance. The evidence shows that MEAN could have incurred an unreserved-use penalty of approximately $1.16 million annually for scheduling transmission on WAPA's bus.

Further, although WAPA had not charged MEAN for using its bus for 18 years, Sidney provides no support for its contention that WAPA would have been precluded from charging MEAN for that unreserved use or any future use. Vojdani testified that he considered penalizing MEAN for its use of the bus, but did not because of MEAN's active and immediate action to correct the issue once it discovered it, but that any future use of WAPA facilities required compensation. Additionally, the evidence shows Sidney was fully informed of the unreserved-use issue before being placed on LAP NITS.

### (ii) LAP NITS Was Lowest Cost Transmission Path

MEAN argues that LAP NITS was the most cost-effective solution to create a complete transmission path to Sidney. It asserts that it diligently considered alternate options but that each would have cost more and been unable to provide Sidney with all of its energy at firm capacity.

WAPA's 115 kV bus constituted a gap in the transmission service to Sidney, and Sidney's facilities connected only to WAPA's bus, so a solution had to be implemented in order for

Sidney to continue receiving energy. Accordingly, the parties' arguments concerning whether the existing transmission path could have been utilized by simply waiving any firm energy requirement imposed by the SSM are without merit. Instead, the limited options available to create a complete transmission path to Sidney included obtaining rights to WAPA's bus, connecting Sidney's facilities to the facilities of an entity other than WAPA, or making Sidney self-sufficient regarding energy generation.

[5] MEAN admitted that it did not consider using Sidney's existing generators as an option to serve Sidney's energy needs. However, Sidney admitted the energy rate from its generators was substantially higher than under the rate schedule, there would have been substantial costs to fix and make its generators compliant with federal regulations, and at full capacity, the generators could produce only 8 MW of energy. The evidence does not suggest the cost of fixing the existing generators or acquiring sufficient additional generators and facilities to produce the other 8 MW of energy Sidney needs. There was also no evidence about the costs or ability of Sidney to build facilities that could connect directly to those owned by Tri-State or another entity. Sidney had the burden of proving that the transmission rate charged by MEAN was unfair, unreasonable, or discriminatory.[9] Thus, Sidney failed to prove these to be viable alternatives to LAP NITS.

The record shows that MEAN considered several alternative options to LAP NITS for serving Sidney. MEAN staff testified that WAPA would not offer any service less than full tariff service, that full tariff service with Tri-State would still require LAP NITS, and that PtP service over WAPA's bus would have cost more than LAP NITS and been less reliable. MEAN's expert also testified that he examined whether other entities could have served Sidney's energy needs and concluded that

---

[9] See *In re Application of Northeast Neb. Pub. Power Dist., supra* note 3.

service from any other entity would have been infeasible because each would have run into at least three points requiring additional transmission contracts.

Based on the evidence presented, we conclude that LAP NITS was the lowest cost solution for transmitting energy to Sidney.

### (iii) Sidney Is Responsible for Costs of Transmission Rights at Sidney West

MEAN contends that the arbitration board erred in finding the POD was located on the MBPP transmission line at the fence of Tri-State's facilities and not on Tri-State's 230 kV bus. MEAN argues that the language of the SSM defines a POD as the "outlet of the interconnected transmission system," which cannot logically be located on a transmission line, and that based on its nature, energy cannot be forced on a specific transmission line. It also argues that the SSM does not require it to transmit Sidney's energy along any specific path. Instead, it asserts that the POD is relevant only because it represents the change in the possession of energy and that the SSM makes Sidney responsible for all transmission costs after the POD.

Sidney argues that exhibit A depicts the POD at the MBPP and Tri-State interconnect on the MBPP line, which testimony established was at the fence around Tri-State's substation. It argues that exhibit A ensured MEAN would transmit Sidney's energy on the MBPP line at 230 kV and across the Tri-State transformer. Sidney also argues that the contract requires MEAN to contract, at its own expense, for all transmission rights necessary to reach Sidney's facilities.

[6,7] In interpreting a contract, a court must first determine, as a matter of law, whether the contract is ambiguous.[10]

---

[10] *Frohberg Elec. Co. v. Grossenburg Implement*, 297 Neb. 356, 900 N.W.2d 32 (2017).

A contract written in clear and unambiguous language is not subject to interpretation or construction and must be enforced according to its terms.[11] A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings.[12]

The SSM defines the POD as that point "at the outlet of the interconnected transmission system . . . at which MEAN is obligated to deliver, and [Sidney] is obligated to accept delivery of, [energy]." Exhibit A places the symbol indicated as the POD on the MBPP line prior to a place identified as Tri-State's 230 kV/115 kV transformer. The POD is identified as the "MBPP/Tri-State 230 kV Interconnection."

The clear and unambiguous meaning of the SSM's definition of the POD is that it is the point where the MBPP line ends—the outlet—and connects to the facilities owned by Tri-State. Sidney argues that the contract would have specified the 230 kV bus if it had intended for the bus to be the POD, as opposed to the interconnect which was actually listed. In fact, there is no 230 kV bus depicted on exhibit A.

The contract is ambiguous regarding where the interconnect between MBPP and Tri-State is located. While Sidney's expert testified that the interconnect is generally located at the fence line of the substation being entered, he acknowledged that there was no change of possession depicted on the diagram in evidence. Nevertheless, it is not necessary to determine the exact location of the POD, whether it is on the transmission line or the specific breaker of Tri-State's 230 kV bus that the MBPP line connects to, because the contract makes the POD relevant only regarding the change of ownership of energy. Therefore, it is sufficient to conclude that the contract places all of Tri-State's facilities on Sidney's side of the point of delivery.

---

[11] *Id.*

[12] *Id.*

- 175 -

Nebraska Supreme Court Advance Sheets
301 Nebraska Reports
CITY OF SIDNEY v. MUNICIPAL ENERGY AGENCY OF NEB.
Cite as 301 Neb. 147

The contract contains no provision specifying a generating source or transmission path required to serve Sidney or any reason for requiring a specific path. However, the placement of the POD in exhibit A does constitute a requirement that MEAN deliver energy to the interconnect of the MBPP and Tri-State facilities. While MEAN argues that it is impossible to actually ensure energy would be transmitted on the MBPP line, there is nothing in the contract that would support deviating from the clear language describing the POD. Instead, MEAN's argument, at best, supports an interpretation that the POD in exhibit A was established for the purely administrative purpose of allocating ownership of the energy and separation of costs.

Sidney argues, and the arbitration board decided, that the SSM requires MEAN to contract for all facilities necessary to connect to Sidney's facilities at its own expense.

Section 5.01 of the SSM states: "MEAN shall furnish, install, lease, contract for and maintain, at its own expense, all equipment and facilities necessary for connecting electric lines and facilities to [Sidney's] facilities at the [POD], including stepdown transformers where service is supplied at [Sidney's] distribution voltage, unless [Sidney] otherwise provides such facilities."

Section 5.04 of the SSM, "[Sidney's] Lines and Equipment," states that "[a]ll lines, substations and other electrical facilities . . . located on [Sidney's] side of the [POD] shall be furnished, installed and maintained by [Sidney]."

The SSM also requires Sidney to pay MEAN for energy in accordance with the provisions of the rate schedule and states that any additional charges for supplying energy through an intervening agency's system, incurred beyond the service included in the rate schedule, will be paid by MEAN and billed to Sidney. The rate schedule specifies that "[t]ransmission service charges . . . for delivery of [Sidney's entire energy needs in excess of its WAPA allocation] shall be billed at the transmission service provider's then-current transmission rates."

- 176 -

Nebraska Supreme Court Advance Sheets
301 Nebraska Reports
CITY OF SIDNEY v. MUNICIPAL ENERGY AGENCY OF NEB.
Cite as 301 Neb. 147

The provisions of the standard form SSM regarding the POD indicate that the POD is typically located at the facilities owned by the city that MEAN is contracting with. In this case, however, exhibit A places the POD at a place requiring at least some contractual rights with intervening transmission service providers to get the energy to Sidney's facilities. Because the contract states that MEAN will contract for the facilities necessary to connect to Sidney's facilities, the arbitration board determined that the right to transmit energy across WAPA's bus to Sidney's facilities was MEAN's responsibility to acquire at its own expense. It was also persuaded by the fact that the contract did not state that Sidney had any requirement to contract for facilities in the article discussing facilities.

However, a complete reading of § 5.01 provides that MEAN is only responsible for contracting facilities connecting "to [Sidney's] facilities *at the* [*POD*]." While the SSM only discusses requirements for Sidney to provide and maintain facilities on its side of the POD, the contract also clearly envisions circumstances where Sidney will be responsible for reimbursing MEAN for transmission charges incurred to deliver its energy. The arbitration board's reading of the contract ignores both the qualifying language regarding MEAN's responsibility to bear the expense for acquiring transmission rights and renders all language regarding Sidney's responsibility to pay for transmission cost superfluous.

The SSM discusses the POD only as a mechanism for shifting ownership of the energy, which also shifts the responsibility for the transmission. Accordingly, we find that the plain language of the SSM allows MEAN to contract for transmission rights on Sidney's side of the POD and pass those expenses on to Sidney. Therefore, the SSM allowed MEAN to contract for transmissions right within Sidney West and pass those expenses to Sidney.

### (iv) Transmission Path With
### LAP NITS Is in Substantial
### Performance of Exhibit A

MEAN argues that its delivery of energy to Sidney through LAP NITS is in substantial compliance with the SSM. It asserts that LAP NITS was required to complete a transmission path to Sidney and that once Sidney was on LAP NITS, the Tri-State Agreement was an unnecessary additional expense. Further, it asserts that the SSM does not require it to deliver energy on any specific path, so its delivery through a new path at a higher capacity level and without unnecessary expenses complies with the SSM.

Sidney argues that exhibit A required MEAN to deliver its energy through the MBPP line and the Tri-State facilities, because that path was highly favorable to Sidney, and that MEAN's change to the POD caused it to incur the additional transmission charges. However, its argument is prefaced on its conclusion that there was no gap in the transmission path.

[8-10] To establish substantial performance under a contract, any deviations from the contract must be relatively minor and unimportant.[13] Substantial performance is shown when the following circumstances are established by the evidence: (1) The party made an honest endeavor in good faith to perform its part of the contract, (2) the results of the endeavor are beneficial to the other party, and (3) such benefits are retained by the other party.[14] Substantial performance is a relative term, and whether it exists is a question to be determined in each case with reference to the existing facts and circumstances.[15]

Based on the facts of this case, we conclude that the specific transmission line the POD was placed on is irrelevant

---

[13] *RM Campbell Indus. v. Midwest Renewable Energy*, 294 Neb. 326, 886 N.W.2d 240 (2016).

[14] *VRT, Inc. v. Dutton-Lainson Co.*, 247 Neb. 845, 530 N.W.2d 619 (1995).

[15] *Id.*

- 178 -

Nebraska Supreme Court Advance Sheets
301 Nebraska Reports
CITY OF SIDNEY v. MUNICIPAL ENERGY AGENCY OF NEB.
Cite as 301 Neb. 147

to MEAN's performance under the SSM; instead, the POD is relevant only to the extent that, as we stated above, it places all financial risk for transmitting energy through Sidney West on Sidney. Thus, we need not consider where the new POD is located specifically, beyond concluding its placement on the interconnect of a transmission line to a facility in Sidney West would be of the same effect.

Sidney elicited extensive testimony regarding the extremely low transmission rate enabled by the transmission path memorialized in exhibit A and Sidney's belief that exhibit A was an agreement with MEAN that ensured a continuation of this low rate. However, the SSM does not protect Sidney from any changes to its transmission path from the third parties who own facilities in Sidney West. Instead, unlike the "Service Schedule J," a previous supplemental agreement which placed all facilities in Sidney West on MEAN's side of the POD and required MEAN to maintain the Tri-State Agreement, the SSM placed the Tri-State facility on Sidney's side of the POD. This change required Sidney to accept all financial risks for changes with the Tri-State Agreement.

Before the SSM was executed, Cutsor specifically informed Sidney that the Tri-State Agreement was terminable at will and that the consequence of termination by Tri-State would be a $300,000 increase in transmission costs. While aware of this issue, Sidney chose to not continue with the previous arrangement which placed all facilities in Sidney West on MEAN's side of the POD and required MEAN to maintain the Tri-State Agreement. By executing the SSM, Sidney accepted the full financial burden of the ever-looming possibility that Tri-State could terminate its favorable transmission path. While the expense for transmitting energy across WAPA facilities was unforeseen, it was another risk for which Sidney accepted financial responsibility.

As we concluded above, Sidney's facilities connect only to WAPA's 115 kV bus, which created a gap in the transmission path to Sidney, and MEAN billed Sidney for the costs of the

lowest cost option to close the gap, placing Sidney on LAP NITS, pursuant to the SSM. Under exhibit A, Sidney had the financial risk for an issue with WAPA's facilities and had to incur this expense. After placing Sidney on LAP NITS, MEAN was able to continue transmitting energy to Sidney as required by exhibit A, if Sidney waived any firm capacity requirements. Thus, Sidney's increased transmission costs did not result from a change in the transmission path but, instead, were incurred because it accepted the financial risk for WAPA's facilities within Sidney West.

Only after Sidney was scheduled to incur the costs to close the gap on its side of the POD with LAP NITS did MEAN decide to change the transmission path required in exhibit A. This change offered substantial benefits to Sidney, which it has since retained. First, Sidney saves the monthly costs of the Tri-State Agreement, which provided rights that were unnecessarily duplicative to transmission rights provided by LAP NITS. Second, Sidney receives all of its energy at firm capacity and has additional protection against curtailment, because WAPA has several lines connecting to Sidney West. Third, LAP NITS includes generation and transmission resources to Sidney, which allows MEAN to redirect LRS and MBPP resources to lower energy rates for all members.

Because Sidney's increased transmission costs resulted solely from its agreement to bear the financial risk for transmission right changes in Sidney West and because MEAN's decision to use a new transmission path only benefited Sidney and MEAN, we conclude its decision to change the transmission path was a good faith effort to perform its duty under the SSM. Thus, we hold that MEAN substantially complied with the SSM and actually provided Sidney benefits by changing the POD.

While Sidney argues, and the board concluded, that MEAN acted in bad faith by unilaterally changing the POD, the evidence presented shows that MEAN's unilateral action to place Sidney on LAP NITS was required because of the use of the

- 180 -

Nebraska Supreme Court Advance Sheets
301 Nebraska Reports
CITY OF SIDNEY v. MUNICIPAL ENERGY AGENCY OF NEB.
Cite as 301 Neb. 147

WAPA 115 kV bus. We are not unsympathetic to the consequences of the parties' mistake of fact regarding the transmission path and the fact that MEAN may have been able to better communicate the issue to Sidney. However, the record shows numerous communications from MEAN to Sidney from July through October 2014, in which MEAN communicated the issue with the transmission path, how it arose, a recommendation for the best solution, justification for its recommendation, the consequences of inaction, and the results of obtaining LAP NITS.

Sidney staff responded that they would make their own independent investigations, but the record does not show that Sidney did so. Further, Sidney refused to accept the changes on the schedule WAPA required to avoid unreserved-use penalties, which MEAN complied with and seemingly convinced WAPA to accept. While Sidney staff testified that MEAN had provided them with no alternatives, the record does not support that testimony. Instead, MEAN exercised its right to incur additional transmission expenses on Sidney's behalf only after Sidney had made no suggestions for alternative options and expressed an unwillingness to accept that a material change in circumstances had occurred.

We conclude that Sidney's rate dispute based on its allegation that MEAN changed the POD in breach of the SSM is without merit. Thus, the arbitration board erred in finding that MEAN breached exhibit A of the SSM to Sidney's detriment.

### (b) MEAN Did Not Breach SSM by Charging Unfair, Unreasonable, or Discriminatory Transmission Rate

The arbitration board made two findings that supported a conclusion that MEAN breached the SSM by charging an unfair, unreasonable, or discriminatory transmission rate: (1) The contract required MEAN to acquire any transmission rights necessary to connect to Sidney's facilities at its own expense, and (2) MEAN inconsistently passed through transmission

charges. As discussed above, the plain language of the SSM made Sidney responsible for all transmission costs on its side of the POD. Therefore, the arbitration board erred in concluding that MEAN was required to pay the transmission costs incurred from LAP NITS.

MEAN argues that it cannot socialize the transmission costs incurred solely to transmit energy to Sidney, because doing such would result in discriminatory charges to its other members. It argues that the charges passed through to Sidney were fair because they are incurred exclusively for Sidney's benefit, reasonable because they are based on the number of MW transmitted to Sidney, and nondiscriminatory both because they are calculated the same by WAPA and MEAN as the charges for every member on LAP NITS and because they were consistent with the average transmission cost ratio for all MEAN members on LAP NITS.

Sidney argues that MEAN should have socialized the cost of its LAP NITS, because MEAN has socialized other communities' transmission costs and MEAN is now benefiting from Sidney's no longer using the LRS and MBPP resources. It also argues that the transmission costs MEAN charges it is discriminatory because its transmission cost ratio had been 1 percent but is now 10 percent of total energy costs.

The arbitration board cited MEAN's socialization of the LRS and MBPP resource costs, the Southwestern Power Pool settlement costs, and the PtP costs for serving Sidney's transmission needs after the 2013 e-tag changes to conclude that MEAN could have socialized the increased transmission costs to Sidney. However, we find that each of these circumstances is distinguishable from the LAP NITS expenses incurred to solely benefit Sidney.

First, the LRS and MBPP resources were obtained for the benefit of all MEAN members, not just Sidney. MEAN obtained about 28 MW of energy from LRS in the early 1980's. The Electrical Resources Pooling Agreement explicitly authorizes MEAN to purchase generation capacity, upon

- 182 -

Nebraska Supreme Court Advance Sheets
301 Nebraska Reports
CITY OF SIDNEY v. MUNICIPAL ENERGY AGENCY OF NEB.
Cite as 301 Neb. 147

approval by the member communities, for the benefit of members. Sidney and the arbitration board seem to presume that because some of these resources served Sidney for 18 years, Sidney is entitled to them, or that they were acquired solely for Sidney's benefit. The board of directors approved the acquisition of these resources and the socialization of their costs to obtain lower energy rates for all of the member communities, so socializing the costs to obtain them across all members was nondiscriminatory.

Second, the costs of the Southwestern Power Pool settlement and PtP used to serve Sidney for 10 months represent expenses incurred because of the actions of MEAN staff, so it is reasonable to socialize them as an organizational expense. While Sidney might not have directly benefited from the unreserved use that led to the Southwestern Power Pool settlement, MEAN staff were responsible for the scheduling of that unreserved use. Accordingly, this expense may be traced to the actions of MEAN as an organization, just as an unreserved-use penalty for the use of WAPA's 115 kV bus for Sidney could have been. In recognition of this organizational risk, the board of directors passed the culture-of-compliance directive to help ensure that the organization would not again incur such expenses.

Additionally, the PtP costs were seemingly incurred because MEAN staff did not act timely in addressing the issue with Sidney's transmission path. MEAN was unable to e-tag a complete path to Sidney for nearly 20 months. It took MEAN staff almost 11 months to even determine what the problem was and another almost 5 months to start working with Sidney on a solution. The record does not establish how MEAN's transmitting energy to Sidney for 10 of the 20 months but the costs of the PtP for the other 10 months, while serving Sidney exclusively, is attributable to an organization expense of MEAN's insufficient response to the problem. Despite the arbitration board's findings, the evidence shows that the PtP was acquired to sell excess organizational energy to lower

- 183 -

Nebraska Supreme Court Advance Sheets
301 Nebraska Reports
CITY OF SIDNEY v. MUNICIPAL ENERGY AGENCY OF NEB.
Cite as 301 Neb. 147

energy rates. The fact that the PtP benefited Sidney exclusively for a justifiable reason did not entitle Sidney to exclusively benefit from the service for the remainder of the SSM. Therefore, the arbitration board erred in ruling that MEAN could have socialized the costs for transmitting energy to Sidney on LAP NITS.

The evidence also shows that the costs of LAP NITS was fair, reasonable, and nondiscriminatory. Sidney is paying for transmission service that solely benefits Sidney and is necessary to transmit Sidney's energy. As MEAN argues, the fact that Sidney had benefited from low transmission costs because of its location historically does not entitle it to such benefit in perpetuity. The evidence shows that WAPA charges all customers based on MW used, not distance traveled. Accordingly, the charges were reasonably based on MEAN's usage of LAP NITS and nondiscriminatory because all LAP NITS customers are charged under the same formula.

### 4. WE DO NOT CONSIDER MEAN'S REMAINING ASSIGNMENTS OF ERROR

The arbitration board and the parties considered exhibit 100 relevant to establishing whether (1) Tri-State had a right to use WAPA's 115 kV bus and (2) WAPA had a right to use Tri-State's transformer to transmit energy to serve Sidney. Regardless of whether or not Tri-State had a right to use WAPA's bus, there was no evidence that it ever assigned such a right to MEAN for transmitting Sidney's energy. Further, we concluded that MEAN has substantially complied with the SSM even if it transmits Sidney's energy from the Archer switchyard to WAPA's 115 kV bus directly without going through Tri-State's facilities. Accordingly, even if exhibit 100 was inadmissible, it had no relevance to our decision.

MEAN's remaining assignments of error concern the remedy ordered by the arbitration board. Because we hold that the arbitration board erred by ruling in favor of Sidney, we need not address the remaining assignments of error.

[11] An appellate court is not obligated to engage in an analysis which is not needed to adjudicate the controversy before it.[16]

## V. CONCLUSION

We conclude that Sidney's increased transmission rate was incurred due to its unauthorized use of WAPA's facilities. Sidney's current transmission costs are approximately 10 percent of Sidney's total energy costs, which is the same average transmission cost ratio for all of MEAN's members. We further conclude that MEAN's actions to gain authorized access to WAPA's facilities, in order to ensure stable energy to Sidney, substantially complied with the requirements of the SSM and that MEAN properly passed the increased transmission rate to Sidney, pursuant to the terms of the SSM. Therefore, we reverse the decision of the arbitration board.

REVERSED.

WRIGHT and KELCH, JJ., not participating.

---

[16] *Eadie v. Leise Properties*, 300 Neb. 141, 912 N.W.2d 715 (2018).